```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 14 2007
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA           :

           - v. -                  :           INFORMATION

BELLE M. SIX,                      :           07 Cr.

                    Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**07 CRIM.   547**

The United States Attorney charges:

### Background

1.  At all times relevant to this Information, Ernst & Young ("E&Y") was one of the largest accounting firms in the world. E&Y provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. Those tax services included preparing tax returns, providing tax advice and tax planning advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court. As part of its tax practice, E&Y had a business unit that was responsible for providing tax advice, as well as financial planning advice, to individuals. That business unit was known as Personal Financial Counseling, or "PFC." E&Y had partners and other professionals throughout the country who were members of the PFC practice.

2..  At all times relevant to this Information, E&Y also had a department within its tax practice known as the National Tax Department ("National Tax"). The individuals assigned to National Tax provided expert tax advice to E&Y professionals in the field. Within National Tax was a sub-group of individuals whose particular areas of expertise related to E&Y's PFC practice.

**Judge Marrero**

3.  In or about early 1998, the national leader of PFC formed a group that would devote itself to designing, marketing, and implementing high-fee tax strategies for individual clients. These strategies included tax shelters that could be used by high-net-worth clients to eliminate, reduce or defer taxes on significant income or gains. The group initially called itself the "VIPER Group" (an acronym for "Value Ideas Produce Extraordinary Results"), but changed its name to the "Strategic Individual Solutions Group," or "SISG," in or about early 2000. Members of the VIPER/SISG group worked together with banks, other financial institutions, law firms and tax shelter promoters to design, market and implement tax strategies.

4.  Defendant BELLE M. SIX was hired by E&Y in early 1998 as a member of the VIPER group. She was not an expert in tax, but was hired to help develop and coordinate the group's sales efforts. As a member of the group until mid-1999, SIX participated -- together with other co-conspirators not named as defendants herein (hereinafter "the co-conspirators") -- in the development, marketing and implementation of tax shelters for E&Y's wealthy clients.

5.  In or about mid-1999, defendant BELLE M. SIX left her employment with E&Y and began to work for a second entity that was involved, together with E&Y, in developing, marketing and implementing tax shelters. In her new employment, SIX acted as a liaison with the VIPER/SISG group, and with PFC professionals throughout the country. She was involved in marketing activities, and she assisted E&Y's clients in implementing tax shelters.

6.  In or about 2000, defendant BELLE M. SIX began working for a third entity that was also involved, together with E&Y, in developing, marketing and

implementing tax shelters. While in that employment, SIX continued to assist in marketing and implementing tax shelters. She also continued to act as a liaison with the VIPER/SISG group, and with E&Y's PFC professionals throughout the country. During SIX's employment with the third entity, the Internal Revenue Service ("IRS") began to examine the tax shelters she had assisted in marketing and implementing. As part of that process, SIX assisted in responding to IRS requests for documents and information, and provided testimony under oath to the IRS. SIX remained in her position with the third entity until 2004.

## Tax Shelter Fraud

7.      During the period from in or about 1998 through 2004, defendant BELLE M. SIX and her co-conspirators, participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the shelters were marketed and sold to clients. The defendant and her co-conspirators designed, marketed and implemented the tax shelters as a means for wealthy individuals with taxable income generally in excess of $10 or $20 million to eliminate or reduce the individual income taxes they would have to pay to the IRS. Thus, instead of paying U.S. individual income taxes that were legally owed (generally, between 20% and 40% of their taxable income), a wealthy client could pay E&Y and others a much smaller amount, calculated largely as a percentage of the desired tax loss or deduction generated by the tax shelter. That amount included the fees payable to E&Y and to E&Y's co-promoters, such as law firms and financial institutions, and typically included a payment used to execute a purported "investment,"

which was designed, in part, to disguise and conceal the true nature and purpose of the tax shelter.

8.  Defendant BELLE M. SIX and her co-conspirators understood that if the IRS were to detect their clients' use of these tax shelters, and learn the true facts and circumstances surrounding the design, marketing and implementation of these shelters, the IRS would aggressively challenge the claimed tax benefits. In that event, the IRS would seek to collect the unpaid taxes plus interest, and might also seek to impose substantial penalties upon the clients. Accordingly, the defendant and her co-conspirators undertook to prevent the IRS from: a) detecting their clients' use of these shelters; b) understanding how the transactions operated to produce the tax results reported by the clients; c) learning that these shelters were marketed as cookie-cutter products that would eliminate, reduce or defer large tax liabilities; d) learning that the clients were not seeking profit-making investment opportunities, but were instead seeking huge tax benefits; and e) learning that, from the outset, all the clients intended to complete a pre-planned series of steps that had been designed by the conspirators to lead to the specific tax benefits sought by the clients.

9.  In order to maximize the appearance that the tax shelters were investments undertaken to generate profits, and to minimize the likelihood that the IRS would learn the transactions were actually designed to create tax losses and deductions, the members of the conspiracy created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent descriptions of the clients' motivations for entering into the transactions, and for taking the various steps that would yield the tax benefits. They also carefully protected internal documents and promotional materials that set forth the tax benefits

and pricing schedules of the shelters against disclosure to the IRS.

10.     Defendant BELLE M. SIX and her co-conspirators undertook these actions so that E&Y could participate in the highly lucrative tax shelter market in which other accounting firms were already participating; so that E&Y could prevent its high-net-worth clients from taking their business (including, potentially, the highly-prized audit business associated with some of these individuals) to its competitors; so that PFC – a business unit that was not a substantial contributor to the firm's revenues – could grow and prosper within the firm; and so the individual conspirators could enhance their own opportunities for professional recognition, advancement, job security, and remuneration.

11.     Among the fraudulent tax shelter transactions designed, marketed, implemented and defended by defendant BELLE M. SIX and her co-conspirators were CDS (an abbreviation for "Contingent Deferred Swap") and CDS Add-On.

a)     CDS was marketed and sold from mid-1999 through in or about 2001. The objective of CDS was to convert a client's ordinary income into capital gains, and defer the client's tax liability from the year in which the income was earned ("Year 1") to the following year ("Year 2"). Defendant BELLE M. SIX participated to some degree in the marketing or implementation of all of E&Y's CDS transactions.

b)     CDS Add-On was marketed for a brief period in mid-2000. The principal objective of CDS Add-On was for the CDS clients to defer indefinitely the income tax liability on the capital gains generated in the second year of the CDS transaction. Defendant BELLE M. SIX participated to some degree in the marketing or implementation of all the CDS Add-On transactions.

12.    For her participation in tax shelter activities during the period after she left her employment with E&Y, defendant BELLE M. SIX received millions of dollars in compensation.

### Statutory Allegations

13.    From in or about early 1998 through in or about 2004, BELLE M. SIX, the defendant, together with others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7212, and Title 18, United States Code, Section 1001.

14.    It was a part and an object of the conspiracy that BELLE M. SIX, the defendant, and her co-conspirators, unlawfully, wilfully and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

15.    It was a further part and an object of the conspiracy that BELLE M. SIX, the defendant, and her co-conspirators, unlawfully, wilfully and knowingly would and did corruptly obstruct and impede, and endeavor to obstruct and impede the due administration of the Internal Revenue laws, in violation of Title 26, United States Code, Section 7212(a).

16.    It was a further part and an object of the conspiracy that BELLE M. SIX, the defendant, and her co-conspirators, unlawfully, wilfully and knowingly would and did make

materially false, fictitious, and fraudulent statements and representations in matters within the jurisdiction of the executive branch of the Government of the United States, in violation of Title 18, United States Code, Section 1001.

### Means and Methods of the Conspiracy

17. Among the means and methods by which defendant BELLE M. SIX and her co-conspirators would and did carry out the objectives of the conspiracy were the following:

a) They would and did design, market and implement tax shelter transactions, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income in fees to E&Y and the other participants in the transactions, rather than paying taxes on that income or gain to the IRS;

b) They would and did design, market and implement tax shelter transactions in ways that made them difficult for the IRS to detect;

c) They would and did design, market and implement tax shelter transactions in ways that disguised the fact that the shelters were largely or exclusively tax-motivated, and lacked substantial non-tax business purposes;

d) They would and did seek to prevent the IRS from learning that they had marketed strategies consisting of pre-planned steps leading to pre-determined tax benefits;

e) They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters and opinion letters;

f)      They would and did make false and misleading statements, including statements under oath, in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing and implementation of the tax shelters.

## OVERT ACTS

18.     In furtherance of the conspiracy and to effect the illegal objects thereof, defendant BELLE M. SIX and her co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a)      Between January 1998 and mid-1999, defendant SIX attended meetings of the VIPER Group at E&Y's offices in New York.

b)      In or about 1999, defendant SIX discussed with a co-conspirator changing the name of one of the CDS partnerships so that it would be more difficult for the IRS to identify the transaction.

c)      At various times during the period from 1999 through 2001, defendant SIX told E&Y professionals that although their prospective CDS clients would have to sign documents accepting personal liability for large loans, as a practical matter, the clients would not face personal liability on those loans.

d)      In or about 2000 and 2001, defendant SIX assisted in the preparation of CDS transaction documents that falsely described the activity in the CDS trading accounts as short-term trading designed to achieve capital appreciation.

e)      In or about 2000, defendant SIX told another individual to remove a reference to early termination of the CDS swap from the CDS economic model.

f) In or about mid-2000, defendant SIX participated with members of the VIPER/SISG group and others in creating a false story that was used to conceal the fact that the CDS Add-On transaction was designed as a tax shelter rather than an investment strategy.

g) In or about mid-2000, defendant SIX assisted in soliciting CDS clients to participate in the CDS Add-On transaction by sending out letters that described CDS Add-On as an opportunity to diversify trading and enhance performance.

h) On or about May 12, 2004, in a deposition taken by the IRS, defendant SIX falsely testified, among other things, that the CDS partnerships were formed to do currency trading and swap trading, and that E&Y's fees were based on the amount used to fund the partnerships.

i) On or about May 12, 2004, in a deposition taken by the IRS, defendant SIX gave misleading and evasive testimony.

(Title 18, United States Code, Section 371).

*Marcus J. Gracia*
_____
MICHAEL J. GARCIA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

- v. -

**BELLE M. SIX,**

Defendant.

**INFORMATION**

07 Cr.

Title 18 United States Code, Section 371

<u>MICHAEL J. GARCIA</u>
United States Attorney.

*[Handwritten notes:]* June 14, 2007 (I'd). Filed waiver of Indictment and Information. Filed consent to proceed before a USMJ on a Felony Plea Allocution. Deft present w/Atty John Moscow, AUSA Deborah Landis, Taikumar Ramaswamy and court reporter present. Deft pleads guilty as charged. Magistrate Judge Freeman recommends that the proffered plea allocution be accepted by Judge Marrero. PSI ordered and a control date set for 12/21/07. Deft ROR.

Freeman, USMJ